JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

16-cv-843

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
PLAINTIFF UNDER SEAL

**DEFENDANTS**
Sun Healthcare Group, Inc., et al. **16  0843**

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Chester County, PA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Sheridan & Murray, LLC  Phone: (215) 977-9500
424 S. Bethlehem Pike, Third Floor
Fort Washington, PA 19034

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☒ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| | | | ☐ 791 Employee Retirement Income Security Act | | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
Proceeding

☐ 2  Removed from
State Court

☐ 3  Remanded from
Appellate Court

☐ 4  Reinstated or
Reopened

☐ 5  Transferred from
Another District
*(specify)*

☐ 6  Multidistrict
Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
31 U.S.C. § 3729 et. seq.
Brief description of cause:
Violation of False Claims Act

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE
02/22/2016

SIGNATURE OF ATTORNEY OF RECORD

FEB 22 2016

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: _____

Address of Defendant: 101 E. State Street, Kennett Square, PA 19348

**16   0843**

Place of Accident, Incident or Transaction: NATIONWIDE

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

   (Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes ☒  No ☐

Does this case involve multidistrict litigation possibilities?        Yes ☐  No ☒

*RELATED CASE, IF ANY:*

Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
      Yes ☐  No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
      Yes ☐  No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
      Yes ☐  No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
      Yes ☐  No ☒

---

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☒ All other Federal Question Cases
   (Please specify) *FALSE CLAIMS ACT*

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, *THOMAS W. SHERIDAN*, counsel of record do hereby certify:

  ☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

  ☐ Relief other than monetary damages is sought.

DATE: 2/22/2016 _____      56939
           Attorney-at-Law          Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

---

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 2/22/2016 _____      56939      **FEB 22 2016**
           Attorney-at-Law          Attorney I.D.#

CIV. 609 (5/2012)



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

PLAINTIFF UNDER SEAL     :     CIVIL ACTION

    v.     :     NO. 16    0843

DEFENDANT UNDER SEAL     :     JURY TRIAL DEMAND

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.     ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.     ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.     ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.     ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)     (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.     ( )

February 19, 2016     Thomas W. Sheridan     Plaintiffs
**Date**        **Attorney-at-law**        **Attorney for**

(215) 977-9500     (215) 977-9800     tsheridan@sheridanandmurray.com
**Telephone**        **FAX Number**        **E-Mail Address**

(Civ. 660) 10/02



**FILED UNDER SEAL**

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| | : | CIVIL ACTION NO.  16  0843 |
| **PLAINTIFF UNDER SEAL** | : | |
| | : | HON. |
| v. | : | |
| | : | **FILED IN CAMERA & UNDER SEAL** |
| **DEENDANT UNDER SEAL** | : | |
| | : | **JURY TRIAL DEMANDED** |

**ORIGINAL COMPLAINT FOR FALSE CLAIMS ACT**
**VIOLATIONS 31 U.S.C. § 3729 ET SEQ.**

Thomas W. Sheridan, Esquire
SHERIDAN & MURRAY, LLC
424 South Bethlehem Pike, Third Floor
Fort Washington, PA 19102
Phone:        (215) 977-9500
Facsimile:    (215) 977-9800

*Of Counsel*:

Joseph Trautwein, Esquire
JOSEPH TRAUTWEIN & ASSOCIATES, LLC
1777 Sentry Parkway West
Abington Hall, Suite 100
Blue Bell, PA 19422
Phone:        (215) 764-2301
Facsimile:    (267) 464-0400

David T. Marks, Esquire
Jacques G. Balette, Esquire
Jason N. Young, Esquire
MARKS, BALETTE & GIESSEL, P.C.
10000 Memorial Drive, Suite 760
Houston, TX 77024
Phone:        (713) 681-3070
Facsimile:    (713) 681-2811

*Counsel for Plaintiff / Relator*

1

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA, STATES OF
CALIFORNIA, COLORADO, CONNECTICUT,
GEORGIA, INDIANA, MARYLAND,
MONTANA, NEW HAMPSHIRE, NEW JERSEY,
NEW MEXICO, NORTH CAROLINA,
OKLAHOMA, RHODE ISLAND, TENNESSEE,
and WASHINGTON, and THE
COMMONWEALTH OF MASSACHUSETTS

16    0843

           Plaintiffs,
           *Ex rel.*

JOHN DOE

           Plaintiff-Relator,

    v.

SUN HEALTHCARE GROUP, INC.;
SUNBRIDGE, INC.; SUNBRIDGE
HEALTHCARE, LLC; and HARBORSIDE
HEALTHCARE CORPORATION

           Defendants.

## ORIGINAL COMPLAINT FOR
## FALSE CLAIMS ACT VIOLATIONS-31 USC § 3729, ET SEQ.

2

This action is brought by John Doe Relator by and through the undersigned attorneys on behalf of the United States of America and States of California, Colorado, Connecticut, Georgia, Indiana, Maryland, Montana, New Hampshire, New Jersey, New Mexico, North Carolina, Oklahoma, Rhode Island, Tennessee, and Washington, and the Commonwealth of Massachusetts, against Sun Healthcare Group, Inc.; Sunbridge, Inc.; Sunbridge Healthcare, LLC; and Harborside Healthcare Corporation who prior to December 1, 2012 owned and operated 127 nursing homes identified in *Exhibit 1*[1] attached hereto (collectively, "SUN" or "Defendants") to recover damages and civil penalties pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, and various state false claims acts[2] for tens of thousands of false claims presented or caused to be presented for payment or approval to Medicare and Medicaid by Defendants.

---

[1] *Exhibit 1* identifies 127 nursing homes, listing the name, provider number, address, and dates of ownership/operation by SUN, and the wholly-owned corporate subsidiary through which SUN operated each facility during all or or portion of the time frame of January 1, 2008 to December 1, 2012. Relator alleges that the facilities listed in *Exhibit 1* engaged in a routine pattern and practice of presenting false claims or causing the same to be presented to federal and state governments during the aforementioned timeframe. The ongoing and routine fraudulent practices by SUN are illustrated by these representative facilities listed in *Exhibit 1*. Additionally, key financial data for the facilities identified in *Exhibit 1* will be provided to the United States of America and States of California, Colorado, Connecticut, Georgia, Indiana, Maryland, Montana, New Hampshire, New Jersey, New Mexico, North Carolina, Oklahoma, Rhode Island, Tennessee, and Washington, and the Commonwealth of Massachusetts with Relator's Disclosure Statement in *Exhibit 1A*.

[2] The state False Claims Acts invoked for purpose of this case include *inter alia*: California (CALIFORNIA FALSE CLAIMS ACT, Government Code §§12650-12656), Colorado (COLORADO MEDICAID FALSE CLAIMS ACT, § 25.5-4-303.5, *et seq.*), Connecticut (CONNECTICUT FALSE CLAIMS ACT FOR MEDICAL ASSISTANCE PROGRAMS, §17b-301, *et seq.*), Georgia (GEORGIA TAXPAYER PROTECTION FALSE CLAIMS ACT, codified at §§ 23-3-120 to 23-3-127 and STATE FALSE MEDICAID CLAIMS ACT, §§ 49-4-168 to 49-4-168.6), Hawaii (HAWAII FALSE CLAIMS ACT, HRS § 661-21, et seq.), Indiana (INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT, IC § 5-11-5.5, *et seq.*), Maryland (MARYLAND FALSE HEALTH CLAIMS ACT § 2-604), Massachusetts (MASSACHUSETTS FALSE CLAIMS ACT, Chapter 12, Part 1, Title II, § 5, *et seq.*), Montana (MONTANA FALSE CLAIMS ACT, MCA § 17-8-406), New Hampshire (NEW HAMPSHIRE FALSE CLAIMS ACT, § 167:61-B, *et seq.*), New Jersey (NEW JERSEY FALSE CLAIMS ACT, NJSA:32-5b), New Mexico (NEW MEXICO FRAUD AGAINST TAXPAYERS ACT, NMSA § 44-9-1, *et seq. and* NEW MEXICO MEDICAID FALSE CLAIMS ACT, § 27-1-1 *et seq.)*, North Carolina (NORTH CAROLINA FALSE CLAIMS ACT, § 1-605, *et seq.*), Oklahoma (OKLAHOMA FALSE CLAIMS ACT, 63 OS § 5053, et seq.), Rhode Island (RHODE ISLAND FALSE CLAIMS ACT, § R.I. Gen. Laws § 9-1.1-1, *et seq.*), Tennessee (TENNESSEE FALSE CLAIMS ACT, § 4-18-101, *et seq.* and TENNESSEE MEDICAID FALSE CLAIMS ACT, § 71-5-181, *et seq.*), Washington (WASHINGTON STATE MEDICAID FRAUD FALSE CLAIMS ACT, Rev. Code Wash. §74.66.005, *et seq.*).

3

## I.   INTRODUCTION

1.      This case involves a nationwide false claim scheme by SUN which is one of the largest nursing home chains in the country to obtain payment from Medicare and Medicaid for necessary resident care that it claimed to have provided, but in fact, did not provide.

2.      SUN implemented and deliberately pursued a strategy to recruit residents[3] with high acuity levels (*i.e.*, residents who were extremely dependent upon staff for their most basic care needs) in order to allow it to reap higher Medicare and Medicaid reimbursements. While pressuring its nursing homes to target and recruit physically-dependent, seriously impaired residents, SUN intentionally understaffed its facilities in order to skim more money from federal and state healthcare payors. These continuing practices not only violated the law but made it humanly and mathematically impossible for the applicable SUN nursing homes to deliver essential care services that they claimed to Medicare and Medicaid were required and provided. In short, SUN was paid for services it claimed to provide, but did not.

3.      Medicare, a federal program, covers care in "skilled nursing facilities" ("SNFs") for a fixed period for those who need skilled nursing services following discharge from a qualifying hospital stay. 42 U.S.C. § 1395i–3. Medicaid, a joint federal and state program, covers long term care in a "nursing facility" ("NF") for those who are medically qualified and dependent on staff for nursing care services. 42 U.S.C. § 1396a. (Since a single SUN facility may and typically does serve residents in each program, the term "nursing home" will refer to a facility with both Medicare and Medicaid residents.) By reason of their loss of physical function and cognitive decline, both Medicare and Medicaid residents may need essential bedside care,

---

[3] The Social Security Act §§ 1810 and 1919, and 42 CFR § 483, *et seq.*, refer to a nursing home *patient* as a *resident*. The terms are used interchangeably herein.

also known as assistance with activities of daily living (ADLs) including (a) toileting assistance,

(b) incontinent care and changing of wet and soiled clothing and linen, (c) assistance transferring

to chair and back, (d) assistance with dressing, (e) assistance with bathing and personal hygiene,

(f) assistance with turning and repositioning immobile residents, (g) feeding assistance, (h) a.m.

and p.m. care, and (i) exercise or range of motion for debilitated residents.

4.      When SUN knowingly admitted Medicare and Medicaid residents, it knew that it

was required by law to provide these essential care services to every resident needing the same.

5.      Despite its aggressive recruitment of residents who were dependent upon nursing

home staff for all or many of the labor-intensive ADLs listed above, SUN deliberately limited

the number of staff allowed to be on duty in its nursing homes. This practice made it impossible

for SUN to deliver the ADL services that it claimed to Medicare and Medicaid were provided to

residents in an individualized resident document known as a Minimum Data Set ("MDS"),[4] as

well as the Comprehensive Care Plan[5] and daily ADL staff support and performance records[6] for

---

[4] The MDS is a document that is required to be completed for every nursing home resident and submitted to Medicare/Medicaid as a condition of payment. The MDS contains a list of specific ADLs required by each resident, as well as a list of the ADL services the nursing home claimed to have provided (including whether any of those services required the assistance of 2 staff members. A nursing home must complete an MDS for each resident upon admission to the facility and then periodically update it at specified times (5-day, 14-day, 30 day, quarterly, annually) and upon significant changes in the resident's condition. The MDS information is collected electronically by the facility and transmitted to states and/or to the national MDS database at CMS. As the Seventh Circuit has stated, the MDS "form is both a billing document and a care assessment certification for Medicare and Medicaid ..." *United States of America ex rel. Absher v. Momence Meadows Nursing Center, Inc.*, Case No. 13-1886, 2014 WL 4092258 (August 20, 2014, 7th Cir.).

[5] The facility must develop a Comprehensive Care Plan for each resident that includes measurable objectives and timetables to meet a resident's medical, nursing, and mental and psychosocial needs that are identified in the comprehensive assessment. 42 CFR S 483.20(k). This document is part of each resident's medical record.

The Comprehensive Care Plan must be—

    (i) Developed within 7 days after completion of the comprehensive assessment;

    (ii) Prepared by an interdisciplinary team, that includes the attending physician, a registered nurse with responsibility for the resident, and other appropriate staff in disciplines as determined by the resident's needs, and, to the extent practicable, the participation of the resident, the resident's family or the resident's legal representative; and

    (iii) Periodically reviewed and revised by a team of qualified persons after each assessment.

each resident.  As a consequence, SUN residents were routinely deprived of essential bedside

care.  SUN employed "staffing ladders" and other mandatory controls designed to limit labor

hours and costs and deliberately forced its nursing homes to be staffed at levels that were (a)

incompatible with the amount of ADL services required by residents, (b) insufficient to deliver

the ADL services for which SUN submitted claims for payment from Medicare and Medicaid,

(c) resulted in SUN violating both federal and state false claims acts and (d) neglected and

harmed its most vulnerable residents.

6.     The profound difference between the amount of ADL services that SUN claimed

to have provided and the amount of those services that were humanly possible given SUN's

staffing is at the heart of this case.

7.     John Doe Relator has direct and independent knowledge that:

a.     SUN continually exerted pressure from the top down on its subject nursing

homes to recruit highly-dependent residents who required assistance with

labor-intensive ADL care.

b.     Despite its aggressive recruitment of highly-dependent residents, SUN

deliberately employed a non-acuity-based staffing scheme that ignored the

essential ADL care needs of its residents and caused the staffing

levels/labor hours to be insufficient to meet the needs of its residents as

defined by their MDSs and Comprehensive Care Plans.

---

The services provided or arranged by the facility must—
   (i) Meet professional standards of quality; and
   (ii) Be provided by qualified persons in accordance with each resident's written plan of care.  42 CFR S
     483.20(k)(2)-(3)
[6] Additionally, facilities must have sufficient medical record documentation to justify the ADL coding in each
resident's MDS for ADL care claimed to be required and provided to residents.

c.    SUN's systemic non-acuity-based staffing practices resulted in dependent residents routinely not receiving the essential ADL care that Defendants certified such residents required and were provided and which directly resulted in resident neglect and harm.

d.    Despite SUN's awareness of the care deprivations its staffing and resident recruitment practices caused, it refused to increase staffing levels or decrease the number of heavy care residents in the subject facilities to make it possible for the limited number of staff to deliver the essential ADL care required by dependent residents.

e.    The staffing targets and resident recruitment targets that SUN imposed and enforced at its facilities made it humanly impossible for the limited numbers of staff to deliver the essential bedside care that SUN claimed in its MDSs, (resident Comprehensive Care Plans) and resident medical records was necessary for and actually provided to its highly-dependent nursing home residents.

8.    Relator has direct knowledge that SUN understaffed each of the subject nursing homes and has quantified the extent to which it deprived residents the basic ADL care that was required and that SUN claimed was provided. SUN nonetheless submitted claims for payment to the federal and state governments for ADL services that were mathematically and humanly impossible for it to have provided.

9.    While the gravamen of Relator's claim, brought pursuant to federal and state False Claims Acts, is that government payors were being billed for services that were not

7

provided, it is also the case here that Defendants have shortchanged care to their most vulnerable resident population – many of whom lack the capacity to complain on their own.

10.     The false claims and statements in this case include tens of thousands of false MDSs submitted to Medicare and Medicaid.  SUN knew that payment from Medicare and Medicaid was conditioned on the accuracy and truthfulness of the information contained in these MDSs and that the submission of false resident ADL information in these MDSs may subject it to substantial criminal, civil and administrative penalties. The false claims in this case also include the various claims for payment that SUN submitted to Medicare and Medicaid, certifying as a condition of payment that the care it claimed to have delivered complied with federal and state laws.

## II.     JURISDICTION AND VENUE

11.     John Doe Relator brings this action on behalf of himself and on behalf of the United States for Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733, and on behalf of the the States of California, Colorado, Connecticut, Georgia, Indiana, Maryland, Montana, New Hampshire, New Jersey, New Mexico, North Carolina, Oklahoma, Rhode Island, Tennessee, and Washington, and the Commonwealth of Massachusetts, for violations of their respective State False Claims Acts (collectively referred to as the "Qui Tam States").

12.     This Court has both subject matter and personal jurisdiction under 31 U.S.C. § 3732, and 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction to entertain common law causes of action as well as claims brought under State False Claims Acts under 28 U.S.C. § 1367(a) and 31 U.S.C. § 3732(b).

13.     Venue is proper in the Eastern District of Pennsylvania pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1391 because one or more of Defendants can (1) be found in, (2) resides

in, and (3) transacts business in this District, and because acts proscribed by 31 U.S.C § 3729

occurred in this District.  More specifically, Sun Healthcare Group, Inc.; Sunbridge, Inc.; and

Harborside Healthcare Corporation all show a current principal place of business located at 101

E. State Street, Kennett Square, Pennsylvania 19348, which is in Chester County and within the

Eastern District.

14.     There has been no public disclosure of the allegations herein.  To the extent that

there has been a public disclosure unknown to the John Doe Relator, he is the "original source"

under 31 U.S.C. § 3730(e)(4) and similar state laws.  John Doe Relator has direct and

independent knowledge of the information on which the allegations are based.

## III.     THE PARTIES

### A.     THE RELATOR

15.     John Doe Relator is a citizen of the United States and has standing to bring this

action under the False Claims Act, 31 U.S.C. § 3730(b)(1) and the various state False Claims

Acts.

16.     John Doe Relator has direct and independent knowledge of the facts and

circumstances giving rise to this claim.

17.     Recognizing that fraud on the government can be diffuse and institutional, the

Relator has established the systemic nature of Defendants' fraudulent practices.

### B.     DEFENDANTS

18.     Based in Irvine, California, Sun Healthcare Group, Inc. was the nation's fifth

largest[7] nursing home chain from 2007 to December 1, 2012, trading on the NASDAQ stock

exchange under the moniker "SUNH."  Consisting of 170 companies, the Sun conglomerate

---

[7] *See Provider Magazine,* "Top 50 Nursing Home Chains," 2007-2012.

operated a national network of 199 to 213 nursing facilities, pumping out billions of dollars in revenues, a substantial portion of which was derived from the Medicare and Medicaid program. Indeed, on December 31, 2011, Sun reported to the Securities and Exchange Commission that it was:

> "a healthcare service company serving principally the senior population with consolidated annual revenues in excess of $1.9 billion … Sun's services are provided through its subsidiaries: as of December 31, 2011, Sunbridge Healthcare, LLC ("Sunbridge") and its subsidiaries operated 165 skilled nursing centers, 14 combined skilled nursing, assisted and independent living centers, 10 assisted living centers, two independent living centers and eight mental health centers with an aggregate of 22,860 licensed beds in 25 states . … Our skilled nursing centers provide services that include daily nursing, therapeutic rehabilitation, social services, housekeeping, nutrition, and administrative services for individuals requiring certain assistance for activities in daily living."[8]

19.    Touting its "strong operating metrics,"[9] and competitive strengths within the long term care industry, Sun's nursing home ("inpatient services") operations generated revenues in excess of $7.5 billion from January 1, 2007 to September 30, 2012, based on a total volume of over 32 million patient days. By far, the largest purchaser of this care was the government, with over 81% of Sun's revenues during this timeframe being derived from the Medicare and Medicaid reimbursement system.[10]

20.    Today, Sun Defendants remain viable entities, continuing to operate a geographically diverse nursing home business sustained by government payments. Effective December 1, 2012, however, Sun Healthcare Group, Inc. and its subsidiaries became indirect

---

[8] See Sun's SEC 10-K Annual Report for fiscal year ending December 31, 2011.

[9] See, for example, Sun's SEC 10-K Annual Reports for fiscal year ending December 31, 2007-2011.

[10] *See* Sun's SEC 10-K Annual Reports for fiscal year ending December 31, 2007 to 2011 and Sun's 10-Qs for 2012 and Skilled Nursing Facility and Skilled Nursing Facility Healthcare Complex Cost Report and worksheets for all individual Sun nursing homes from 2008 to 2012.

wholly owned subsidiaries of Genesis Healthcare, LLC[11] through an agreed stock purchase by Genesis of all Sun shares (the "Merger"). According to the *Agreement and Plan of Merger*, Sun Healthcare Group, Inc. (and its subsidiaries) "shall continue as [a] surviving company in the merger." Moreover, according to acquisition documents and diagrams filed by Genesis with state nursing home regulatory agencies, Sun Healthcare Group, Inc., Sunbridge, Inc., and Sunbridge Healthcare, LLC "remain the same post-merger," with said Defendants continuing in the chain of ownership and operation of the subject nursing homes.

21.     Sun Healthcare Group, Inc. is a Delaware corporation with its principal place of business located at 101 E. State Street, Kennett Square, Pennsylvania 19348.

22.     Sunbridge, Inc. is a New Mexico corporation with its principal place of business located at 101 E. State Street, Kennett Square, Pennsylvania 19348.

23.     Sunbridge Healthcare, LLC is a New Mexico limited liability company with its principal place of business located at 101 Sun Avenue NE, Albuquerque, New Mexico  87109.

24.     Harborside Healthcare Corporation is a Delaware corporation with its principal place of business located at 101 E. State Street, Kennett Square, Pennsylvania 19348.

25.     Of particular relevance to this case are the 127 SUN owned, operated, managed, and/or maintained nursing homes listed in *Exhibit 1* by name, address, and provider number. These nursing homes are both "skilled nursing facilities" and "nursing facilities" as such are defined by Sections 1819 and 1919 of the Social Security Act, 42 U.S.C. §§ 1395i-3 and 1396r, as well as by state laws and regulations governing the operation of nursing facilities. With

---

[11] Genesis Healthcare, LLC is a Delaware corporation headquartered in Kennett Square, Pennsylvania. At the time of its acquisition of Sun Healthcare Group, Inc., Genesis was also one of the nation's largest providers of skilled nursing and rehabilitation care, operating over 200 facilities. According to Genesis' press release issued December 3, 2012, "the merger of the two companies has created one of the largest skilled nursing providers in the country with 422 skilled nursing centers in 29 states."

11

respect to each of the nursing homes listed in *Exhibit 1,* SUN entered into provider agreements with Medicare and Medicaid and systematically presented false claims for government payment under each facility's unique provider number in violation of 31 U.S. § 3729, as described in more detail below.

26.    Also, as described in more detail below, the facilities listed in *Exhibit 1* were not only owned, operated, controlled, managed, and dominated by Defendants but were also mere agents, instrumentalities, or conduits through which the SUN Defendants did business. Defendants managed, operated, obtained licenses, and distributed the revenues, profits and assets for a national network of nursing homes, including the facilities listed in *Exhibit 1.* By reason of the conduct described herein, Defendants and the subject nursing homes directly participated in the false claim violations described herein and were the alter egos of one another, there being a sufficient unity of interest and ownership among and between them that the acts of one were for the mutual benefit of and can be imputed to the others.

## IV.    MEDICARE, MEDICAID, AND SUN'S CERTIFIED CLAIMS OF STAFF AND CARE PROVIDED

27.    The federal and state governments are the principal purchasers of nursing home services, primarily through their Medicare and Medicaid programs.  Medicare is a federal government health program primarily benefiting the elderly and disabled that is administered by CMS.  Medicare pays for short-term post-acute nursing home care that includes skilled nursing and rehabilitation services (in what it calls "skilled nursing facilities" or "SNFs").  It covers up to 100 days of nursing home services per episode of illness after a qualifying inpatient hospital stay.  Medicare's payments to SNFs are for the provision of both skilled nursing services and the ADLs needed by the Medicare beneficiary.

28.    Congress created Medicaid at the same time it created Medicare in 1965 by
adding Title XIX to the Social Security Act.  Medicaid is a public assistance program that pays
for medical expenses of primarily low-income residents.  Funding for Medicaid is shared
between the federal government and state governments.  The federal government also separately
matches certain state expenses incurred in administering the Medicaid program.  Medicaid pays
for services pursuant to plans developed by the states and approved by the U.S. Department of
Health and Human Services ("HHS") through CMS.  42 U.S.C. §§ 1396a(a)-(b).  Medicaid pays
for long term care in a "nursing facility" (NF), including ADLs, for those who are medically
qualified and dependent on staff for nursing care services.  42 U.S.C. § 1396a.

29.    Federal law requires operators of both SNFs and NFs to conduct a comprehensive
assessment of each residents' specific needs, and to submit the list of these needs to CMS.  42
U.S.C. § 1395i–3 (Medicare); 42 U.S.C. § 1396 (Medicaid).   The nursing homes report this list
in a document known as the "Minimum Data Set" ("MDS") for every resident in the nursing
home regardless of the resident's age, diagnosis, length of stay, or payment category (*i.e.*,
Medicare, Medicaid, or private insurance).  42 CFR § 483.20.  In *Section G* of the MDS, the
nursing home provides a specific list of the ADL care each resident needs and a list of the ADL
services the nursing home claimed to have provided to the resident.  An example of *Section G* of
the MDS is set forth below:

13

## Section G — Functional Status

**Coding:**

**Activity Occurred 3 or More Times**
0. **Independent** - no help or staff oversight at any time
1. **Supervision** - oversight, encouragement or cueing
2. **Limited assistance** - resident highly involved in activity; staff provide guided maneuvering of limbs or other non-weight-bearing assistance
3. **Extensive assistance** - resident involved in activity, staff provide weight-bearing support
4. **Total dependence** - full staff performance every time during entire 7-day period

**Activity Occurred 2 or Fewer Times**
7. **Activity occurred only once or twice** - activity did occur but only once or twice
8. **Activity did not occur** - activity (or any part of the ADL) was not performed by resident or staff at all over the entire 7-day period

**Coding:**
0. **No setup or physical help from staff**
1. **Setup help only**
2. **One person physical assist**
3. **Two+ persons physical assist**
8. **ADL activity itself did not occur during entire period**

| | 1. Self-Performance ↓ Enter Codes in Boxes ↓ | 2. Support ↓ Enter Codes in Boxes ↓ |
|---|---|---|
| **A. Bed mobility** - how resident moves to and from lying position, turns side to side, and positions body while in bed or alternate sleep furniture | 3 | 3 |
| **B. Transfer** - how resident moves between surfaces including to or from: bed, chair, wheelchair, standing position (excludes to/from bath/toilet) | 3 | 3 |
| **C. Walk in room** - how resident walks between locations in his/her room | 8 | 8 |
| **D. Walk in corridor** - how resident walks in corridor on unit | 8 | 8 |
| **E. Locomotion on unit** - how resident moves between locations in his/her room and adjacent corridor on same floor. If in wheelchair, self-sufficiency once in chair | 8 | 8 |
| **F. Locomotion off unit** - how resident moves to and returns from off-unit locations (e.g., areas set aside for dining, activities or treatments). **If facility has only one floor,** how resident moves to and from distant areas on the floor. If in wheelchair, self-sufficiency once in chair | 8 | 8 |
| **G. Dressing** - how resident puts on, fastens and takes off all items of clothing, including donning/removing a prosthesis or TED hose. Dressing includes putting on and changing pajamas and housedresses | 3 | 2 |
| **H. Eating** - how resident eats and drinks, regardless of skill. Do not include eating/drinking during medication pass. Includes intake of nourishment by other means (e.g., tube feeding, total parenteral nutrition, IV fluids administered for nutrition or hydration) | 1 | 2 |
| **I. Toilet use** - how resident uses the toilet room, commode, bedpan, or urinal; transfers on/off toilet; cleanses self after elimination; changes pad; manages ostomy or catheter; and adjusts clothes. Do not include emptying of bedpan, urinal, bedside commode, catheter bag or ostomy bag | 3 | 3 |
| **J. Personal hygiene** - how resident maintains personal hygiene, including combing hair, brushing teeth, shaving, applying makeup, washing/drying face and hands (excludes baths and showers) | 2 | 2 |

### G0120. Bathing

How resident takes full-body bath/shower, sponge bath, and transfers in/out of tub/shower (excludes washing of back and hair). Code for most dependent in self-performance and support

| Enter Code | A. Self-performance |
|---|---|
| 3 | 0. **Independent** - no help provided |
| | 1. **Supervision** - oversight help only |
| | 2. **Physical help limited to transfer only** |
| | 3. **Physical help in part of bathing activity** |
| | 4. **Total dependence** |
| | 8. **Activity itself did not occur during the entire period** |

| Enter Code | B. Support provided |
|---|---|
| 3 | (Bathing support codes are as defined in item **G0110 column 2, ADL Support Provided**, above) |

*Example:*  MDS 3.0 Section G

14

30.     On each MDS SUN submitted to CMS and state governments, it made specific claims in *Section G* of the MDS[12] regarding both the functional status of each of its residents ___and___ the number of staff provided to help residents with each ADL: (a) bed mobility, (b) transfer, (c) walk in room, (d) walk in corridor, (e) locomotion on unit, (f) locomotion off unit, (g) dressing, (h) eating, (i) toilet use, (j) personal hygiene, and (k) bathing.[13]

31.     Every nursing home operated by SUN is required to accurately assess and code in Column 1 ("Self-Performance") each resident's ability to perform each ADL, and in Column 2 ("Support") the level of assistance and support required by and provided to each resident by nursing home staff for each ADL.  In the example above, the use of code "3" in Column 1 to describe the resident's ability to perform basic ADL functions indicates the resident has minimal ability to perform these basic functions and is highly dependent on nursing home staff for the same.  Further, by coding a "3" in various "staff support" boxes under Column 2, the nursing home in this example claims that the resident required and was provided *2-person physical assistance* by nursing home staff for those specific *ADL* functions.  Thus, the example above indicates the resident required (and was provided) the assistance of two nursing home staff members in connection with moving in her bed (Bed Mobility), transfers to and from her bed (Transfer), and the use of toilet (Toileting).

32.     Every time SUN submitted an MDS to the federal and state government for a resident, SUN made the following certification or one substantially similar to it (emphasis added):

---

[12] A true and complete copy of MDS 2.0 and 3.0 will be produced to the United States and the above listed states with Relator's Disclosure Statement.

[13] Further, to support its specific MDS claims regarding the ADL care required and provided to residents, Defendants created medical record documentation of the ADL needs and care provided each resident.

15

I certify that the accompanying information **accurately reflects resident assessment information** for this resident and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable **Medicare and Medicaid** requirements. I understand that this information is used as a basis for ensuring that patients receive appropriate and quality care, and **as a basis for payment from federal funds**. I further **understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information**, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for **submitting false information**. I also certify that I am authorized to submit this information by this facility on its behalf.

33. Each SUN nursing home was also required to submit staffing data to CMS, including specific information as to the time available to certified nurse aides and licensed nurses in a CMS-671 form[14] as part of the annual survey process. As stated in CMS's State Operations Manual, completion of the Form CMS-671 is a condition of payment by Medicare and Medicaid:

> Skilled nursing facilities and nursing facilities **must be in compliance** with the requirements in 42 CFR Part 483, Subpart B **to receive payment under Medicare or Medicaid**. To certify a skilled nursing facility or nursing facility, complete at least:
>
> • A life safety code survey; and
>
> • A standard survey (Forms **CMS-**670, **671**, 672, 677, 801 through 807).

(*emphasis added*).[15]

34. SUN also repeatedly submitted claims to Medicare and Medicaid for payment for resident care. If the resident was covered by Medicare, then the SUN facility - which was proving SNF services and seeking reimbursement for the same – submitted a claim to a Medicare

---

[14] A copy of the CMS-671 form will be produced to the United States and the above listed states with Relator's Disclosure Statement.

[15] State Operations Manual, Chapter 7 - Survey and Enforcement Process for Skilled Nursing Facilities and Nursing Facilities, pp. 23-24, (Rev. 12/13/13). *Also see* §§1819 and 1919 of the Social Security Act which require the survey process.

Administrative Contractor ("MAC") on either the 837I electronic form or the CMS-1450 paper form. Medicare pays SNFs a pre-determined daily rate for each day of care under a prospective payment system ("PPS"). *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998). The PPS payment is expected to cover all operating and capital costs that efficient facilities would be expected to incur in furnishing SNF services (Medicare will pay more for certain high-cost, low-probability ancillary services not relevant here). This PPS payment consists of a nursing component and a therapy component. Both of these are adjusted for (1) geographic differences and (2) the facilities "case mix index" ("CMI"). As described below, the CMI is unique to each facility and incorporates information from *Section G* of the MDS.

35.      SUN also repeatedly submitted-claims for payment to state Medicaid programs to receive payments for residents covered by Medicaid, using an electronic form that contains similar information as to that found in the CMS 1450. While state Medicaid program payments to NFs vary from state to state, every state (except Maryland and Wyoming) uses a prospective payment system similar in nature to the Medicare PPS system. The Medicaid programs in many states (such as Colorado, Georgia, Indiana, Massachusetts, Montana, New Hampshire, North Carolina, and Washington), like Medicare, adjust the daily payment amount (a per diem payment) based on the facility's CMI which includes the information SUN reported in *Section G* of each resident's MDS. [16] The Medicaid Programs in a few states (such as California, Connecticut, and Tennessee) also pay NFs a per diem rate but do not use a case mix index in making adjustments to the per diem rate.

---

[16] *See generally*, Colo. Rev. Stat. § 25.5-6-202 (Colorado); Ga. Laws 111-4-1-.10 (Georgia); 405 Ind. Admin. Code 5-13-3 (Indiana); 130 Mass. Code. Reds. 456.401 *et. seq.* (Massachusetts); Mont. Admin. R. 37.40.307 (Montana); N.H. Rev. Stat. 151-E *et seq.*, (New Hampshire); North Carolina Clinical Coverage Policy 2B-1, publically available at http://www.ncdhhs.gov/dma/mp/2B1.pdf (North Carolina); and Wash. Admin. Code 388-96-010 *et seq.*, (Washington).

36.   As a provider of health care to frail and elderly nursing home residents covered by Medicare and Medicaid, SUN repeatedly affirmed and certified to federal and state governments for each of the subject nursing homes that the services it was paid by taxpayers to provide complied in all respects with applicable law and conditions of payment. In addition to its certifications regarding the MDS and CMS-671 forms described above, SUN also certified that it would abide by Medicare and Medicare regulations as a condition of payment.

37.   The Social Security Act and federal regulations require all nursing homes to have sufficient numbers of nursing staff, including certified nurse aides (CNAs), to provide "nursing and related services to attain or maintain the highest practical physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care."[17]   42 U.S.C. § 1395i-3(b)(4)(A)(i); 42 U.S.C. § 1396r(b)(4)(A)(i); and 42 C.F.R. § 483.30. Further, every nursing home:

> [M]ust provide services by sufficient numbers of each of the following types of personnel on a 24-hour basis to provide nursing care to all residents in accordance with resident care plans: (i) Except when waived under paragraph (c) of this section, licensed nurses; and (ii) Other nursing personnel [including certified nurse aides (CNAs)].[18]

42 C.F.R. § 483.30(a)(1). These staffing laws and regulations require, as condition to Medicare/Medicaid reimbursement, that each nursing home must have sufficient numbers

---

[17] The definition and specific requirements for a "resident assessment" (also known as a Minimum Data Set or MDS) and "individual plan of care" are also set forth in 42 U.S.C. § 1395i-3(b)(4)(A)(i), 42 U.S.C. § 1396r(b)(4)(A)(i), and 42 C.F.R. § 483.30.

[18] "Other nursing personnel" includes certified nurse aides (CNAs), which are specifically defined in 42 C.F.R. § 483.75 as:

> [A]ny individual providing nursing or nursing-related services to residents in a facility who is not a licensed health professional, a registered dietitian, or someone who volunteers to provide such services without pay. Nurse aides do not include those individuals who furnish services to residents only as paid feeding assistants as defined in § 488.301 of this chapter.

18

of staff on a 24-hour basis to provide the basic bedside care services needed by residents,

as defined by each resident's MDS assessment and individual plan of care.

38.     Further, Medicare and Medicaid payments to nursing homes are explicitly

premised upon compliance with § 1819(d)(1) (Medicare) and § 1919(d)(1) (Medicaid) of the

Social Security Act (42 U.S.C. § 1395i-3(d)(1)(A) and 42 U.S.C. § 1396r(d)(1)(A)) that provide:

> A skilled nursing facility (and "non-skilled" nursing facility) must be
> administered in a manner that enables it to use its resources effectively and
> efficiently to attain or maintain the highest practicable physical, mental, and
> psychosocial well-being of each resident.

39.     SUN's repeated assurances that it would comply with these laws began when it

filed applications for each of its nursing homes to participate in the Medicare program.  Each

SUN facility subject to this case completed a *Medicare Enrollment Application for Institutional*

*Providers* (CMS-855A), certifying and affirming on an ongoing basis that:

> I agree to abide by the Medicare laws, regulations and program instructions that
> apply to this provider. The Medicare laws, regulations, and program instructions
> are available through the Medicare contractor.
>
> I understand that **payment of a claim** by Medicare is **conditioned** upon the claim
> and the *underlying transaction complying with such laws, regulations, and*
> *program instructions* (including, but not limited to, the Federal anti-kickback
> statute and the Stark law), and on the *provider's compliance* with all applicable
> conditions of participation in Medicare.
>
> My signature legally and financially binds this provider to the laws, regulations,
> and program instructions of the Medicare program. (*emphasis added*).

40.     Further, in order to qualify for Medicare payments, SUN's nursing homes were

required to sign and did, in fact, execute *Health Insurance Benefit Agreements* (CMS-1561)

under 42 U.S.C. § 1395cc, conditioning payment on compliance with federal regulations,

including those referenced above.  Specifically, these Agreements state, "In order to *receive*

19

*payment* under [Medicare]," the nursing home, "as the provider of services, agrees to conform to

the ... applicable provisions in 42 CFR."[19]

41.    SUN's certifications as compliance for payment from Medicare are described in

the *Medicare Benefit Policy Manual*. This *Manual* provides that payment for care in a SNF is

covered only if all of the following conditions were met:

- The patient requires skilled nursing services or skilled rehabilitation services, i.e., services that must be performed by or under the supervision of professional or technical personnel (*see* §§30.2 -30.4); are ordered by a physician and the services are rendered for a condition for which the resident received inpatient hospital services or for a condition that arose while receiving care in a SNF for a condition for which he received inpatient hospital services; [and]

- The patient requires these skilled services on a daily basis (*see* §30.6); [and]

- As a practical matter, considering economy and efficiency, the daily skilled services can be provided only on an inpatient basis in a SNF (*see* §30.7.); and

- The services delivered are reasonable and necessary for the treatment of a patient's illness or injury, i.e., are consistent with the nature and severity of the individual's illness or injury, the individual's particular medical needs, and accepted standards of medical practice. ***The services must also be reasonable in terms of duration and quantity.***

**If any one of these four factors is not met, a stay in a SNF, even though it might include the delivery of some skilled services, is not covered.** For example, payment for a SNF level of care could not be made if a resident needs an intermittent rather than daily skilled service.

*Medicare Benefit Policy Manual*, Ch. 8, § 30 (*emphasis added*).

42.    Accordingly, throughout the applicable timeframe in this case, SUN knew that

Medicare would not pay it for services that were: (1) not reasonable, (2) not consistent with the

---

[19] *Id.* CMS Form 1561 is available at http://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1561.pdf

nature and severity of the resident's individual needs, (3) not consistent with accepted standards

of medical practice, and (4) not reasonable both in terms of *duration and quantity*.

43.    Another condition of Medicare payment is found in the Patient's Assessment

Requirements of the Social Security Act:

> A skilled nursing facility **must conduct** a comprehensive, accurate, standardized, reproducible **assessment of each resident's functional capacity**, which assessment—
>
> (i) describes the resident's *capability to perform daily life functions and significant impairments* in functional capacity;
>
> (ii) is based on a uniform minimum data set [MDS] specified by the Secretary . . .;
>
> (iii) uses an instrument which is specified by the State under subsection (e)(5); and
>
> (iv) includes the identification of medical problems.
>
> Each such [MDS] assessment must be conducted or coordinated (with the appropriate participation of health professionals) by a registered professional nurse who signs and *certifies* the completion of the assessment. Each individual who completes a portion of such an assessment shall sign and *certify as to the accuracy* of that portion of the assessment.

42 U.S.C. 1395i–3 and 42 U.S.C. 1396r (*emphasis added*). Put simply, to be paid by Medicare

and Medicaid, nursing homes must accurately complete MDS assessments for each and every

resident.

44.    Each SUN nursing home also signed a Medicaid Provider Agreement agreeing

that the provider is only entitled to be reimbursed for furnishing covered services when all

federal and state laws, regulations and program rules have been followed by the provider. Each

state's Provider Agreement is slightly different, but this over-riding similarity that compliance

with law is a required condition of payment is present throughout the country and in every state

involved in this litigation.

21

45.     Similarly, the various state regulations under Medicaid establish the same requirements that are present under federal law concerning using nursing home resources to meet resident needs and having sufficient staff to meet those needs.

46.     Finally, submission of accurate and true MDS information is also a condition of payment under Medicaid just as it is for Medicare.  Accordingly, SUN certified in every one of its Medicaid and Medicare residents' MDSs that:

> I certify that the accompanying information accurately reflects resident assessment information for this patient and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. **I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds.** I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information. I also certify that I am authorized to submit this information by this facility on its behalf. [*emphasis added.*]

## V.    SUN PACKED ITS NURSING HOMES WITH HEAVY CARE RESIDENTS WHILE UNDERSTAFFING ITS NURSING HOMES

47.     John Doe Relator has direct and independent knowledge that the resident-to-staff ratios established and enforced by the company made it humanly impossible to deliver the essential ADL care required by dependent residents due to the sheer number of residents they were assigned and the residents' overwhelming needs.  As a consequence of nursing home staff not having enough time to provide the basic daily care, residents frequently were (a) forced to use their beds as toilets; (b) left in their own urine and feces for extended periods ("until the urine had dried and formed brown rings on the bed linens" or "until the feces had dried and stuck hard to the resident's body"); (c) left in pajamas/gowns and not gotten out of bed; (d) left in bed in the same position for hours on end; (e) left with a food tray next to the bed without any

22

feeding assistance; (f) left smelly and unclean, unshaven, and unbathed; (g) left yelling/crying

for help after call lights were pushed but not answered; (h) not provided oral care; (i) not

encouraged or even given liquids to drink; and (j) found on the floor due to a lack of assistance.[20]

48.    Predictably, the residents who experienced the most care deprivation were those

who were most vulnerable and unable to move or transfer from bed to chair, who did not have

control of bowel and bladder function, whose wet and soiled clothing frequently had to be

changed, and who were incapable of feeding themselves, bathing themselves, dressing

themselves, and getting out of bed by themselves. Based on Relator's direct and independent

knowledge, these are the very type of residents who SUN targeted for recruitment.

49.    In its quest to increase revenues and cash flows,[21] SUN directed and required

every nursing home in its chain to target and recruit high acuity residents including those

requiring 2-person assist. These targeted residents shared a common dependence upon nursing

home staff for basic bedside care including: (a) toileting assistance, (b) incontinent care and

changing wet/soiled clothing/linen, (c) assistance transferring in and out of bed/wheelchair, (d)

repositioning in bed or wheelchair, (e) assistance with feeding and hydration, and (f) bathing and

personal hygiene.

---

[20] A study done by the United States Government Accountability Office ("GAO") in 2008 described widespread, nationwide patterns of state surveys failing to identify deficiencies in the delivery of basic ADL care. The most frequently missed type of deficiency identified in these resurveys was poor quality of care, including things like failing to ensure proper nutrition and hydration and failing to prevent pressure sores. A 2009 study by the GAO identified several causes for this high level of deficiency understatement including the high number of survey tasks that surveyors were expected to complete, surveyors' inexperience with the survey methodology, and surveyor workforce shortages. The limitations of the survey process and the likelihood that surveys significantly understate ADL care issues at nursing homes are well-known and well-documented.

[21] SUN's corporate strategy of increasing occupancy levels, numbers of high acuity residents, and revenues and cash flows came from the top down. This strategy was memorialized in multiple SEC filings and emails.

A.   SUN PRESSURED ITS NURSING HOMES TO INCREASE OCCUPANCY RATES AND
RECRUIT HEAVY CARE RESIDENTS

50.   Like all large nursing homes chains, SUN's goal is to fill all its beds in each of its nursing homes. More residents translate to more revenue. While there is nothing wrong with maximizing resident census[22] and revenue, it is wrong to do so when facility staffing levels have been deliberately limited to the point that needed care cannot be provided to residents.

51.   SUN made resident recruitment a top company-wide priority. Drops in a nursing home's resident census (also known as "negative budget variances") were regarded as a crisis by the Company, which strictly monitored the number of filled and empty beds each day in every one of its facilities.

52.   Relator has information and reason to believe that SUN also sought to increase its admission of high acuity residents who required more care because federal and state health care programs pay more for such residents. Indeed, some heavy care residents are so dependent that two CNAs are required to provide certain services; these are known as 2-person assists. Compared to a resident that did not require a 2-person assist, SUN could collect over $115 dollars more per resident, per day in Medicare reimbursement for a resident requiring 2-person assist for ADL services, such as assistance for toileting/incontinent care, repositioning in bed, and transferring bed to chair and back. For this reason, SUN required every nursing home to target high rate-of-pay residents, including those requiring 2-person assist.

53.   With a finite number of beds, SUN wanted them filled with heavy care, high rate-of-pay residents. Due to the fierce competition that existed in the marketplace for such residents,

---

[22]"Census" is the count of residents in a nursing home.

24

SUN had a coordinated strategy to ensure that its nursing homes were aggressively recruiting heavy care residents.  SUN hired admission coordinators and sales directors who were required to follow SUN's corporate wide marketing action plans designed to increase admissions of heavy care residents.

54.     SUN's payor and patient acuity targets emanated from the top of SUN's corporate structure and were implemented throughout the company.

**B.     SUN STAFFED ITS NURSING HOMES WITHOUT REGARD TO RESIDENT NEEDS**

55.     As noted above, federal law requires that every nursing home must have sufficient numbers of nursing staff, including CNAs, to provide all nursing and related care services to each resident as defined by and in accordance with his/her MDS and individualized care plan. 42 U.S.C. § 1395i-3(b)(4)(A)(i); 42 U.S.C. § 1396r(b)(4)(A)(i); 42 C.F.R. § 483.30 and § 483.30(a)(1).  These federal laws mandate that SUN staff its nursing homes based on the resident acuity, including the ADL services defined in MDS *Section G* that are required by each home's unique resident population.

56.     SUN deliberately ignored these regulations.  Rather than basing staffing on resident acuity, SUN SUN implemented a company-wide policy that in effect restricted staffing at its facilities to an average 2.01 PPD, regardless of the residents' needs.

57.     Relator has reason to believe that to ensure compliance with its prescribed staffing targets, SUN restricted the staffing at its nursing homes, issuing mandatory ratios to control the number of licensed nurses and CNAs on each work shift in each SUN nursing home.

58.     The staffing targets prescribed for each facility were closely monitored and enforced by SUN.  SUN used payroll software programs to meticulously track all staffing levels and identify staffing or budget variances at each of its facilities on a daily basis.  The results of

this monitoring were regularly reported to SUN on an ongoing basis from at least 2008 through 2015. These reports show that SUN set, knew, and controlled the staffing levels at each of its nursing homes.

59.      During the relevant time frame, SUN made it clear to the employees of each nursing home that the inability to comply with SUN's staffing targets and budgets was unacceptable. Relator has reason to believe that nursing home administrators unable to comply with SUN's set staffing targets were admonished and/or fired. Verbal and written communications, including emails, were routinely sent from Regional Senior Vice President and District Directors of Operations making it clear that facilities had to run their labor hours according to the prescribed budget.

### C.     SUN KNEW ITS ADMISSION AND STAFFING POLICIES RESULTED IN POOR CARE THAT HARMED ITS RESIDENTS

60.      SUN's policies of admitting as many residents as possible and recruiting high acuity residents (which maximized workload) while understaffing its nursing homes resulted in residents not receiving necessary care. The fallout from such policies not only resulted in lawsuits by families of residents, but also generated complaints from SUN's own employees, all of which placed Defendants on notice of the consequences of their business decisions.

61.      SUN knew that the levels of staff it mandated and enforced in its facilities made it impossible to meet the needs of residents as defined by *Section G* of the MDS, care plans, and the ADL flow records. At all pertinent times, SUN was aware that core care services required by the heavy care residents it recruited vastly exceeded the physical work capacity of the limited number of CNAs approved to work in its facilities.

62.     Further, SUN knew its policies of maximizing workload levels while minimizing labor levels created a dangerous gap between the amount of time required by caregivers to provide the necessary *Section G* care versus the amount of time available to provide such care.

63.     As previously described, SUN implemented a company-wide staffing policy.  In prescribing and enforcing these staffing levels, SUN either knew of or acted with reckless disregard to widely disseminated and scientifically uncontroverted findings that:

     a.    CNA staffing levels of 1:8 day shift, 1:10 evening shift, and 1:20 night shift had been determined to cause very long waits for services and no assistance during meals for many residents, even when staff worked hard.[23]

     b.    Staffing at 2.2 CNA hours per patient day was predicted to result in long waits for service and inconsistent implementation of care even when staff worked at unrealistically high productivity levels.[24]

     c.    Staffing at the CNA levels SUN dictated, in its staffing ladders, and enforced, had been determined to cause 2-3 hour waits for changes of diapers and wet linens, as well as high rates of omitted care and missed or late food service.[25]

     d.    In even low workload nursing homes, 2.8 CNA hours per patient day were minimally required to meet the core care needs of residents as defined by their MDS assessments.[26]

64.     Such findings were published by CMS in 2001 in its Report to Congress. Accordingly, five years after CMS tested the effects of CNA staffing levels on care and reported its findings, SUN implemented mandatory policies and staffing ladders requiring its nursing homes to staff at the very same CNA PPDs and ratios known to cause widespread and significant care deprivation.

---

[23] Phase II Final Report to Congress:  *The Appropriateness of Minimum Nursing Staff Ratios in Nursing Homes*, 3-28.

[24] *Id.* at 1-7.

[25] *Id.* at 3-25, 26.

[26] *Id.* at 3-31.

65.     Furthermore, SUN knew the CNA staffing levels it imposed upon its facilities were also woefully below the minimum nursing home staffing levels recommended by the Institute of Medicine in 2004.[27]

66.     By reason thereof, in continuing to pressure its nursing homes to hit CNA staffing targets, SUN knew it was humanly impossible for the limited workforce in its facilities to provide:  (a) the essential bedside care required by the high acuity residents it purposely recruited; and (b) essential bedside care and staff support it claimed to have actually provided in *Section G* of each resident's MDS.

67.     The human costs of SUN's staffing practices were often drastic and devastating: they caused deprivations of human dignity, suffering, injuries, and even death to residents across the country.  While the severity and nature of the injuries suffered by residents varied due to a number of factors,[28] the core care omission levels at SUN's subject facilities remained intractably high due to the SUN's willful blindness to the effects of its staffing based on headcount without consideration of acuity.

68.     The disparity between SUN's staffing and acuity in the subject facilities had real world consequences.  Not only were residents of these facilities forced to suffer the indignities

---

[27] The Institute of Medicine in its 2004 report entitled, *Keeping Patients Safe,* recommended a minimum of "one RN for every 32 patients (0.75 hours per resident day), one licensed nurse for every 18 patients (1.3 hours per resident day), and one nurse assistant for every 8.5 patients (2.8 hours per resident day)."  The IOM's recommendations were based on the findings contained in CMS's Phase II Report to Congress, *Appropriateness of Minimum Nurse Staffing Ratios in Nursing Homes*.

[28] Factors affecting the degree and nature of injury suffered by residents exposed to routine understaffing and core care omissions include: (a) the precise nature of the resident's dependency and length of exposure to care deprivation, (b) whether the resident received a proportionate or disproportionate share of the limited care, (c) how care omissions for an individual resident were distributed among the *Section G* core services, *i.e.*, which basic services were neglected the most, (d) the individual resident's physiological capacity to withstand care deprivation, and (e) the extent to which the resident's diagnosis and chronic disease process mask facility neglect.

and health consequences from such routine care omissions, they further were subjected to long

waits for the most basic human care.

**VI.   THE PRINCIPAL PURCHASER OF SUN'S NURSING HOME SERVICES: FEDERAL AND STATE GOVERNMENTS**

69.    Federal and state Medicare and Medicaid programs are the primary purchasers of

SNF and NF services, and the major source of income for SUN's nursing homes.[29]  From 2008

to 2012, SUN's nursing home operations generated revenues well in excess of $7.5 billion, based

on a volume of over 32 million resident days.  By far, the largest purchaser of this nursing home

care was the government, with over approximately 80% of these revenues since 2008 being

derived from the Medicare, Medicare Advantage, and Medicaid.

**VII.   SUN'S FALSE CLAIMS**

70.    SUN knowingly and methodically presented or caused to be presented false or

fraudulent claims for payment by or approval of the United States government as well as state

governments in violation of 31 U.S.C. § 3729(a)(1)(A) and similar state False Claim Acts.  From

at least 2008-2014, SUN knowingly presented or caused to be presented false or fraudulent

claims by submitting false MDS forms and by submitting false claims for PPS payments for

thousands of nursing home residents.

71.    The MDS form "both a billing document and a care assessment certification for

Medicare and Medicaid ..." *United States of America ex rel. Absher v. Momence Meadows

Nursing Center, Inc.*, Case No. 13-1886, 2014 WL 4092258 (August 20, 2014, 7th Cir.).  Each

MDS SUN submitted to CMS with false information is a false claim; each is also, as described

below, a false statement that caused a false claim to be submitted.  In addition to the MDS forms,

---

[29] Most SUN nursing homes are certified to provide both Medicare and Medicaid services.

the claims SUN submitted to Medicare and Medicaid for PPS payments for services that it did not provide are also false claims.

72.    SUN knowingly made, used, or caused to be made or used false statements, claims, and certifications in its MDS assessments which it (a) knew were a material condition of payment; (b) knew were the basis of payment from federal and state funds; (c) knew that such claims were required to be accurate and truthful as expressly certified; and (d) knew were impossible.

73.    Further, from 2008 to 2012, SUN knowingly presented or caused to be presented false or fraudulent claims to Medicare and Medicaid for per diem payments, usually via the CMS 1450, 837I, 1450 and 1500 forms, for services that it did not provide.  Additionally, these forms also contained false and inflated RUG and HIPPS billing codes.

74.    Government payment to SUN for nursing home care, by statute, is conditioned on that care being "reasonable."  As set forth above, the care that SUN delivered to its residents was so patently unreasonable in duration, quantity, and medical value that SUN's submission of requests for payments for the same constituted false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(A) and (B), as well as similar state False Claims Acts.

75.    Furthermore, throughout the timeframe of this case SUN understood -- and certified -- in its Medicare Enrolment Application for Institutional Providers (CMS-855A) and Health Insurance Agreements (CMS-1561) that payment of claims by Medicare and Medicaid were conditioned upon the claim and underlying transaction complying with applicable laws. Accordingly, SUN knew that its payments from federal and state governments were conditioned on compliance with those previously discussed regulations which govern: (a) nursing home allocation and use of government funds, 42 C.F.R. § 483.75; and (b) essential staffing, 42 CFR §

483.30. Moreover, by reason of the above enrollment certifications, SUN certified, as to each Form CMS-1450 (UB-04) it submitted for payment, that it had complied with the above regulations. SUN's certifications of compliance stand in contrast to its knowing violations of these laws by its diversion of government payments intended for nursing home care and decision to staff its facilities without regard for resident acuity.

76.     In addition to the above, as a matter of practice, SUN knowingly made, caused to be made, or used false records and statements within the medical records of numerous residents to support and mask its false claims for payment and certifications of compliance. Such conduct also violated 31 U.S.C. § 3729(a)(1)(B).

## A.     THE AMOUNT OF DAILY PAYMENT TO SUN UNDER MEDICARE AND MOST MEDICAID PROGRAMS HINGED UPON ACCURATE REPORTING ON THE MDS FORM

77.     Medicare and most Medicaid programs[30] paid SUN and other nursing home providers a predetermined daily amount on a per resident, per day basis. The per diem rate for each Medicare and Medicaid resident was determined, in part for Medicare and for most Medicaid programs, by the MDS assessment that was a *prerequisite to payment* for all Medicare and Medicaid claims.

78.     The Medicare program uses a prospective payment system ("PPS") to pay a predetermined daily rate to nursing homes (also called a per diem payment). *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998). Numerous Medicaid programs use a similar per diem payment system.[31]

---

[30] These states include Alabama, Arizona, California, Connecticut, Colorado, Georgia, Indiana, Idaho, Kentucky, Maine, Massachusetts, Missouri, Montana, Nebraska, Nevada, New Hampshire, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Utah, Vermont, Virginia, Washington, and Wisconsin.

[31] *Id.* As previously noted, these states adjust the daily Medicaid payment amount based on the facilities CMS.

31

79.    Medicare and Medicaid programs adjust the per diem rate based on a variety of factors.  Medicare and most Medicaid programs recognize the differences in resources utilized by residents in determining a range of per diem reimbursement rates.  Some residents require total assistance with their activities of daily living, while others require less assistance.  The recognition of these differences forms the premise for Medicare's and most Medicaid programs' "case-mix" adjustment to the per diem rate which alters the reimbursement amount based on the resource needs of each resident in a particular nursing home.  Residents with heavy care needs require more staff resources, and payment levels are higher than for those with less intensive care needs.  In a case-mix adjusted payment system, the amount of reimbursement to a nursing home is based on the resource intensity of the resident as measured by items on the MDS, including *Section G*.[32]

80.    Accordingly, insomuch as these MDS ADLs are used to classify each resident into different case-mix categories called Resource Utilization Groups ("RUGs"), SUN's coding of residents' needs and services provided directly influenced the amount of its Medicare and most Medicaid payments.

**B.    RELATIONSHIP BETWEEN MDS, RUGS, AND SUN'S MEDICARE PER DIEM PAYMENTS**

81.    The daily PPS/per diem rate that Medicare and various Medicaid programs pay a nursing facility depends, in part, on the RUG to which a resident is assigned which, as stated above, is calculated off a resident's MDS.  Each distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries (*i.e.,* residents) with similar characteristics or resource needs.  The number of possible RUGs

---

[32] CMS's RAI Version 3.0 Manual, Chapter 6, *Medicare Skilled Nursing Facility Prospective Payment System (SNF PPS)*.

categories and the corresponding payment rate depends on whether RUG-III or RUG-IV was in effect. For Medicare, for example, from January 1, 2006, to October 1, 2010, there were 53 RUGs in the RUG-III classification system. *See* 70 Fed. Reg. 45026 to 45031 (Aug. 4, 2005). After October 1, 2010, Medicare began the implementation of RUG-IV which recognized 66 possible resident classifications and payment rates. Regardless of whether payment was based on a RUG-III or RUG-IV classification, at all times material to this case, the per diem rate for Medicare and most Medicaid programs for each of the 53 to 65 RUGs categories[33] was based on CMS-initiated nursing home staff time measurement studies and estimated cost for required care.

82.     The RUG-IV classification system has eight major classification categories: (1) Rehabilitation Plus Extensive Services, (2) Rehabilitation, (3) Extensive Services, (4) Special Care High, (5) Special Care Low, (6) Clinically Complex, (7) Behavioral Symptoms and Cognitive Performance Problems, and (8) Reduced Physical Function. All eight major categories, except for Extensive Services, are further subdivided based on the resident's *late loss* ADL score which enables Medicare (and/or a Medicaid program) to distinguish those nursing home residents requiring more care and therefore requiring more resources.[34]

83.     In addition to reflecting a resident's rehabilitation therapy needs and special clinically complexities, each RUG also takes into account each resident's ability to perform and the staff support provided for the following four activities of daily living ("ADLs"): (1) toileting,

---

[33] CMS has made certain modifications to the RUG-III structure through its RUG-IV classification system, which became effective October 1, 2010. CMS added new clinical RUG categories, modified the timeframe in which each assessment must be performed, required that nursing facilities assess changes in the level of therapy every seven days, and revised certain rules pertaining to group therapy, among other changes. 74 Fed. Reg. 40288 (Aug. 11, 2009).

[34] CMS's RAI Version 3.0 Manual, Chapter 6.3, *Resource Utilization Groups Version IV (RUG-IV)*. Additionally, the Special Care High, Special Care Low, and Clinically Complex categories are also divided by the presence of depression. Finally, the Behavioral Symptoms and Cognitive Performance Problems and the Reduced Physical Function categories are divided by the provision of restorative nursing services.

33

(2) bed mobility, (3) transferring in and out of bed or chair, and (4) eating. These four ADL activities are known as "late-loss" ADLs because of the fact that they are generally the last physical functions to be lost in the cycle of life. For RUGs classification purposes, each resident received a "*late loss*" ADL score[35] that is based on the resident's dependency levels and staff support that SUN provided in *Section G* of the MDS. For example, a very dependent resident who (a) could not toilet, change position in bed, or transfer without assistance and (b) was provided 2-person staff support would receive the maximum "*late loss*" ADL score of 4 for each of these three *late loss* ADLs or a total *late loss* score of 12 (not including feeding).[36] Significantly, to obtain the highest "*late loss*" ADL score, highest RUG code, and largest Medicare (and/or Medicaid) reimbursement, a nursing home must claim in *Section G* of the MDS that the resident was provided the assistance of two staff members for a number of these "*late loss*" ADLs. In sum, the extent of the "*late loss*" ADL services required by a resident and actually provided by staff significantly impacts the resident's RUGs classification and the nursing home's corresponding payment from Medicare and most Medicaid programs.

84.     For example, the table below contains the 2013-2014 RUG rates paid by Medicare for nursing homes operated in rural areas. Medicare makes annual adjustments to RUGs rates based on locality and wage index. *See* 42 U.S.C § 1395yy(e)(4)(E)(ii)(IV). An adjusted chart similar to that found below (Table 4) is available for each county in the United States where a facility is operated. The first column in Table 4 below identifies each of the 8 major RUG Categories that are associated with a rehabilitation level or clinical needs grouping.

---

[35] CMS recognizes that the "*late loss*" ADL score is "very important component of the classification process." "Other ADLs are also very important, but the research indicates that the *late loss* ADLs predict resource use most accurately." *See* CMS RAI Version 3.0 Manual, CH 6: Medicare SNF PPS, page 6-24.

[36] Under MDS 2.0 which was in effect until October 1, 2010, the possible *late loss* ADL scoring ranged from 4 to 18. Under MDS 3.0, the *late loss* ADL scoring ranged/ranges from 0 -16.

The second column provides an abbreviated description of the rehabilitation or clinical basis for the RUG grouping, and the third column provides the specific RUG payment classification utilizing a three letter code.  Column four provides a breakdown of the possible MDS "*late loss*" ADL Scores for each RUG billing code, and the fifth and final column provides the corresponding per diem rate for each RUG classification.

| Major RUG Category | RUG Description | RUG Billing Code | MDS *Late Loss* ADL Scores | Rural RUG Daily Rate |
|---|---|---|---|---|
| 1 | RU (Rehab Ultra-High) | RUX | 11 to 16 | $778.44 |
| | RU (Rehab Ultra-High) | RUL | 2 to 10 | $762.60 |
| 2 | RU (Rehab Ultra-High) | RUC | 11 to 16 | $602.61 |
| | RU (Rehab Ultra-High) | RUB | 6 to 10 | $602.61 |
| | RU (Rehab Ultra-High) | RUA | 0 to 5 | $512.32 |
| | RV (Rehab Very High) | RVX | 11 to 16 | $683.97 |
| | RV (Rehab Very High) | RVL | 2 to 10 | $617.44 |
| | RV (Rehab Very High) | RVC | 11 to 16 | $509.72 |
| | RV (Rehab Very High) | RVB | 6 to 10 | $446.36 |
| | RV (Rehab Very High) | RVA | 0 to 5 | $444.77 |
| | RH (Rehab High) | RHX | 11 to 16 | $612.55 |
| | RH (Rehab High) | RHL | 2 to 10 | $549.18 |
| | RH (Rehab High) | RHC | 11 to 16 | $438.29 |
| | RH (Rehab High) | RHB | 6 to 10 | $397.11 |
| | RH (Rehab High) | RHA | 0 to 5 | $352.75 |
| | RM (Rehab Medium) | RMX | 11 to 16 | $556.67 |
| | RM (Rehab Medium) | RML | 2 to 10 | $512.32 |
| | RM (Rehab Medium) | RMC | 11 to 16 | $380.84 |
| | RM (Rehab Medium) | RMB | 6 to 10 | $358.66 |
| | RM (Rehab Medium) | RMA | 0 to 5 | $298.46 |
| | RL (Rehab Low) | RLX | 2 to 16 | $484.52 |
| | RL (Rehab Low) | RLB | 11 to 16 | $364.13 |
| | RL (Rehab Low) | RLA | 0 to 10 | $238.98 |
| 3 | ES (Extensive Services) | ES3 | 2 to 16 | $670.87 |
| | ES (Extensive Services) | ES2 | 2 to 16 | $526.71 |
| | ES (Extensive Services) | ES1 | 2 to 16 | $471.27 |
| 4 | (Special Care High) | HE2 | 15 to 16 | $455.43 |

35

| Major RUG Category | RUG Description | RUG Billing Code | MDS *Late Loss* ADL Scores | Rural RUG Daily Rate |
|---|---|---|---|---|
| | (Special Care High) | HD2 | 11 to 14 | $426.92 |
| | (Special Care High) | HC2 | 6 to 10 | $403.15 |
| | (Special Care High) | HB2 | 2 to 5 | $398.40 |
| | (Special Care High) | HE1 | 15 to 16 | $379.39 |
| | (Special Care High) | HD1 | 11 to 14 | $357.22 |
| | (Special Care High) | HC1 | 6 to 10 | $338.21 |
| | (Special Care High) | HB1 | 2 to 5 | $335.04 |
| 5 | (Special Care Low) | LE2 | 15 to 16 | $414.24 |
| | (Special Care Low) | LD2 | 11 to 14 | $398.40 |
| | (Special Care Low) | LC2 | 6 to 10 | $350.88 |
| | (Special Care Low) | LB2 | 2 to 5 | $333.45 |
| | (Special Care Low) | LE1 | 15 to 16 | $347.71 |
| | (Special Care Low) | LD1 | 11 to 14 | $335.04 |
| | (Special Care Low) | LC1 | 6 to 10 | $297.02 |
| | (Special Care Low) | LB1 | 2 to 5 | $284.35 |
| 6 | (Clinically Complex) | CE2 | 15 to 16 | $369.89 |
| | (Clinically Complex) | CD2 | 11 to 14 | $350.88 |
| | (Clinically Complex) | CC2 | 6 to 10 | $308.11 |
| | (Clinically Complex) | CB2 | 2 to 5 | $285.93 |
| | (Clinically Complex) | CA2 | 0 to 1 | $243.16 |
| | (Clinically Complex) | CE1 | 15 to 16 | $341.38 |
| | (Clinically Complex) | CD1 | 11 to 14 | $322.37 |
| | (Clinically Complex) | CC1 | 6 to 10 | $285.93 |
| | (Clinically Complex) | CB1 | 2 to 5 | $265.34 |
| | (Clinically Complex) | CA1 | 0 to 1 | $227.32 |
| 7 | (Behavior Symptoms and Cognitive Performance) | BB2 | 2 to 5 | $257.42 |
| | (Behavior Symptoms and Cognitive Performance) | BA2 | 0 to 1 | $214.65 |
| | (Behavior Symptoms and Cognitive Performance) | BB1 | 2 to 5 | $246.33 |
| | (Behavior Symptoms and Cognitive Performance) | BA1 | 0 to 1 | $205.14 |
| 8 | (Reduced Physical Functioning) | PE2 | 15 to 16 | $341.38 |
| | (Reduced Physical Functioning) | PD2 | 11 to 14 | $322.37 |
| | (Reduced Physical Functioning) | PC2 | 6 to 10 | $278.01 |
| | (Reduced Physical Functioning) | PB2 | 2 to 5 | $236.82 |

36

| Major RUG Category | RUG Description | RUG Billing Code | MDS *Late Loss* ADL Scores | Rural RUG Daily Rate |
|---|---|---|---|---|
| | (Reduced Physical Functioning) | PA2 | 0 to 1 | $197.22 |
| | (Reduced Physical Functioning) | PE1 | 15 to 16 | $325.53 |
| | (Reduced Physical Functioning) | PD1 | 11 to 14 | $306.52 |
| | (Reduced Physical Functioning) | PC1 | 6 to 10 | $265.34 |
| | (Reduced Physical Functioning) | PB1 | 2 to 5 | $227.32 |
| | (Reduced Physical Functioning) | PA1 | 0 to 1 | $189.30 |

85.     *Table 4: Rural RUG Rates for 2013-2014 (unadjusted for location)*The RUG

billing is incorporated into the Health Insurance Prospective Payment System (HIPPS) code that

SUN submits to Medicare (or to the various state Medicaid programs) and would affect the

amount paid to SUN.

86.     SUN used CMS software, or private software developed with the CMS tools, to

encode and electronically transmit to Medicare and/or Medicaid its residents' most current MDS

assessment data and to automatically convert the data into a RUG billing group/HIPPS code

which it submitted per resident on at least a monthly basis as part of its request for payment.  In

the PPS/per diem claims submitted by SUN to Medicare and Medicaid programs, the first three

characters in the HIPPS code matched the RUG billing code and the last two characters defined

the applicable payment periods and the type of assessment.

87.     Accordingly, submission of false MDS forms were also false statements that

caused Medicare and various Medicaid programs to pay SUN in excess of what SUN was

actually entitled to receive.

## VIII.  SUN FINANCED ITS EXPANSION STRATEGY, DEBT, BLOATED CORPORATE OVERHEAD, AND RELATED PARTY TRANSACTIONS BY STEALING FROM THE GOVERNMENT

88.     During the time period described above in which SUN has schemed to defraud the

government of millions of dollars in Medicare and Medicaid reimbursements, its revenues and

37

returns on investment have grown to record levels. Rather than deploying its Medicare and Medicaid funds in a manner to ensure that the most basic needs of its vulnerable residents were met, SUN diverted taxpayer dollars specifically earmarked for nursing home care to fund its purchase of non-nursing home related businesses, pay for massive corporate administrative fees and related party transaction profits which were disguised as expenses. This scheme siphoned off critical Medicare and Medicaid dollars from nursing homes that could have paid for critically needed nurse aide staffing. Rather than using such funds, as intended, to provide care to meet the needs of its residents, SUN reallocated and repurposed these resources to fund SUN's:

    a.  bloated general and administrative expenses for the aggregate enterprise totaling $282 Million from 2008 through third quarter 2012;[37]

    b.  self-dealing through its related-party subsidiaries that funneled over $392 Million out of the conglomerate's nursing home revenue stream between 2008 and 2012;[38]

    c.  lavish compensation and performance bonuses paid to the top senior executives despite the fact that the enterprise's revenue stream primarily derived from taxpayer funding;[39]

    d.  internal corporate restructuring which occurred on November 15, 2010[40] and resulted in:

---

[37] *See* Sun's SEC 10-K Annual Reports for fiscal year ending December 31, 2008 to 2011 and Sun's 10-Q, for the first three quarters of 2012.

[38] *See* Skilled Nursing Facility and Skilled Nursing Facility Healthcare Complex Cost Report and worksheets for all individual Sun nursing homes from 2008 to 2012.

[39] *See* Sun's SEC 10-K Annual Reports for fiscal year ending December 31, 2008 to 2011 and SEC 10-Q for the first three quarters of 2012

[40] *See Sun Healthcare to Split in Two*, The Senior Care Investor, Volume 22, Issue 6, June 2010. Sun recognized that in 2009 the median total return on healthcare REITs was almost 30%. However, company share prices had risen by just 4% in 2009 and had been flat and down in the first several months of 2010. In order to monetize and unlock the value of their real property portfolio which consisted of 93 facilities, Sun split out the owned real estate from the operating company (which held the required license and certificate of need) and created a new real estate

i. the real estate assets and operating assets of Sun being separated into two distinct publicly traded companies in order to "unlock the value" of the company's real estate holdings for stockholders, with Defendants transferring ownership of the real estate for 93 properties (which included 82 skilled nursing facilities, 9 assisted living facilities and 2 mental health facilities) to a newly formed *PropCo*; [41]

ii. $72,389,000 cash being distributed to the newly-formed *PropCo* out of the company's total available cash reserves;[42] and

iii. Defendants' annual lease payments/rent effectively doubling (going from $72 million in fiscal year 2008 and 2009 to $148 million in fiscal year 2011) as a consequence of the long term triple net lease agreements said Defendants were required to enter into with the newly formed *PropCo*;[43] and

e. substantial leveraged debt which required Sun to:

i. Dedicate a significant portion of the cash flows from its nursing home operations, to make debt service payments;[44] and

---

investment trust from that real estate that would simply collect rent from the operating company (thus, effectively guaranteeing a rate of return based on the long term lease payments).

[41] On November 15, 2010, Defendants transferred the ownership of the real property for 93 facilities to a newly formed and separated *PropCo*.(Sabra Healthcare REIT, Inc.). *See* 5/25/10 transcript of Sun Healthcare Group, Inc.'s conference call to discuss restructuring and 9/28/10 letter from Sun Healthcare Group, Inc. to SEC explaining restructuring.

[42] *See* Sun's SEC 10-K Annual Report dated December 31, 2010, page 25.

[43] *Id.,* at page F-25. As noted above, Defendants' new capital structure increased the pressure on available cash by doubling rent expense. Although this new structure reduced debt service payments and depreciation expenses, the increased rent exceeded the cost savings by approximately $33 Million annually.

[44] Prior to the November 2010 restructuring, Defendants' long-term debt (which included mortgage notes, term loans, and senior subordinated notes) amounted to $700,548,000, according to Sun's SEC 10-K Annual Report for

ii. Comply with the restrictive financial covenants contained in the loan agreements with a syndicate of financial institutions, which included significant operating limitations on how nursing home revenues were used, imposed through a variety of financial thresholds and ratios—the breach of which subjected Sun to default and accelerated maturity of the indebtedness.[45]

89.     In short, not only were taxpayers and nursing home residents ultimately saddled with the cost of this complex transaction, they were also hobbled by Defendants' staggering corporate overhead, related-party transactions, immense debt service payments and restrictive loan covenants which drained vital funds from each nursing home.

## IX.   SUN'S DIRECT PARTICIPATION IN THE OPERATION OF ITS NURSING HOMES AND JOINT VENTURE RESPONSIBILITY

90.     Defendants Sun Healthcare Group, Inc.; Sunbridge, Inc.; Sunbridge Healthcare, LLC; and Harborside Healthcare Corporation *directly participated* in the false claim violations described above at the subject nursing homes by:

a.     requiring SUN nursing homes to increase their occupancy rates and target high acuity residents, whose needs were well beyond the care capabilities of the nursing home's staff;

b.     directing SUN's nursing homes to: (i) recruit and admit high acuity residents and increase resident; and (ii) retain residents whose needs exceeded the qualification and care capability of the nursing home staff;

---

fiscal year ending December 31, 2010, at page F-16.  Post-restructuring, Defendants' long-term debt amounted to $155,980,000.

[45] *See* Sun's SEC 10k Annual Report for fiscal year ending December 31, 2011.

c.     determining and controlling at each SUN nursing home: (i) the numbers of staff and hours of labor at each facility, (ii) the expenditures for labor, (iii) the revenue targets, census targets and payor-mix targets, and (iv) resident recruitment strategies and discharge practices;

d.     overriding the decisions of nursing home administrators, department heads and licensed nursing staff charged with the legal responsibility for determining the staffing necessary to meet the needs of residents; and

e.     submitting claims for payment on behalf of its nursing homes and centrally controlling the claims and reimbursement process at each nursing home.

91.     Further, Defendants and the nursing homes listed in *Exhibit 1* were the alter egos of one another, each forming a part of a single entity. Defendants exerted pervasive and continual control over the nursing homes listed in *Exhibit 1* such that the nursing homes were mere agents, instrumentalities and conduits through which Defendants did business.

92.     Furthermore, at all times material, Defendants treated the funds of one entity as the funds of another. Defendants collected, distributed and shared the revenues, profits, and assets of its nursing homes. They also continually siphoned all the revenues from each of the individual nursing homes including those listed in *Exhibit 1* into a centralized master account. Additionally, Defendants diverted revenues away from nursing homes to related business entities. Without control of their revenues and with no significant assets, SUN's nursing homes were entirely dependent on Defendants for their continued existence and ongoing operations.

93.     Each of SUN's nursing homes were grossly undercapitalized with essentially all cash generated by the nursing home's operations swept into accounts controlled by the

41

Defendants. The Defendants collected and managed all revenues created by operations of its nursing homes and controlled all of their expenditures.

94.    Defendants and the nursing homes portrayed themselves as a single entity, publicly promoting themselves as a unified nation-wide operation through brochures, marketing materials, website, communications with the media, as well as correspondence to state licensing and certification agencies. SUN is a vertically-integrated company that uses "SUN" as a brand, often branding its facilities and inserting a "SUN" logo throughout facility policies, procedures, and forms, as well as the medical records of residents.

95.    Defendants also provided a broad range of administrative, consulting, and support services to SUN's nursing homes, including accounting and administrative services, auditing, compliance services, cost report preparation and audit representation, legal services, operational consulting and oversight support, and local, state, and federal tax preparation.

96.    Accordingly, there is and was sufficient unity of interest and ownership among and between each Defendant and the subject nursing homes, such that the acts of one were for the benefit of and could be imputed to all others. Further, at all times herein mentioned, each Defendant acted as the agent and partner of, conspired and participated in a joint venture with the remaining Defendants. Furthermore, in engaging in the conduct described below, the Defendants all acted with the express or implied knowledge, consent, authorization, approval, and/or ratification of their Co-Defendants.

## X.    COUNTS

### COUNT ONE
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

97.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

42

98.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

99.    By virtue of the conduct described above, Defendants knowingly, deliberately, and/or in reckless disregard of the truth presented or caused to be presented to Medicare, Medicaid and other Government funded health insurance programs and/or to the contractors that ran these programs on behalf of the Government false or fraudulent claims for the improper payment or approval of nursing home services.

100.    Defendants knowingly, deliberately, and/or in reckless disregard of the truth, supported and continue to support claims to Medicare, Medicaid and other Government funded health insurance programs and/or to the contractors that ran these programs on behalf of the Government false or fraudulent claims for the improper payment or approval of nursing home services.

101.    The United States and its contractors, unaware of the falsity or fraudulent nature of the claims that the Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

102.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWO
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

103.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

104.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

43

105.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used false statements material to false or fraudulent claims submitted to Medicare, Medicaid and other Government funded health insurance programs and/or to the contractors that ran these programs on behalf of the Government false or fraudulent claims for the improper payment or approval of nursing home services.

106.    Defendants knowingly, deliberately, and/or in reckless disregard of the truth, supported and continue to support claims to Medicare, Medicaid and other Government funded health insurance programs and/or to the contractors that ran these programs on behalf of the Government false or fraudulent claims for the improper payment or approval of nursing home services.

107.    The United States and its contractors, unaware of the falsity of the statements made, used, or caused to be made or used by Defendants, paid for claims that otherwise would not have been allowed.

108.    By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

**COUNT THREE**
**California False Claims Act, Cal. Gov't Code § 12651(a)(1) and § 12651(a)(2)**

109.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

110.    This is a claim for treble damages and civil penalties under the California False Claims Act, Cal. Gov't Code § 12650, *et seq*.

111.    By virtue of conduct described above, Defendants knowingly presented or caused to be presented to the California Medicaid program (i.e., Medi-Cal) false or fraudulent claims for improper payment for nursing home services.

44

112.    The California Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

113.    By reason of these payments, the California Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT FOUR
### Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 (1)(a)

114.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

115.    This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.4, *et seq*.

116.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Colorado Medicaid program false or fraudulent claims for payment or approval for improper payment for nursing home services.

117.    The Colorado Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

118.    By reason of these payments, the Colorado Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT FIVE
### Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5 (1)(b)

119.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

120.    This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-303.4, *et seq*.

121.    By virtue of the conduct described above, Defendants knowingly made, used or caused to made or used false records or statements material to a false or fraudulent claim made to the Colorado Medicaid program for improper payment for nursing home services.

45

122.    The Colorado Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

123.    By reason of these payments, the Colorado Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT SIX
### Connecticut False Claims Act, Conn. Gen. Stat. § 17B-301B(a)(2)

124.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

125.    This is a claim for treble damages and civil penalties under the Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b, *et seq.*

126.    By virtue of the conduct described above, Defendants knowingly made, used or caused to made or used false records or statements material to a false or fraudulent claim made to the Connecticut Medicaid program false or fraudulent claims for improper payment for nursing home services.

127.    The Connecticut Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

128.    By reason of these payments, the Connecticut Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT SEVEN
### Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1(a)(1)

129.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

130.    This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168, *et seq.*

46

131.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Georgia Medicaid program false or fraudulent claims for improper payment for nursing home services.

132.    The Georgia Medicaid program, unaware of the falsity or fraudulent nature of the claims that the Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

133.    By reason of these payments, the Georgia Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT EIGHT
### Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.1(a)(2)

134.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

135.    This is a claim for treble damages and civil penalties under the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168, *et seq.*

136.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used false statements material to false or fraudulent claims for improper payment for nursing home services.

137.    The Georgia Medicaid program, unaware of the falsity of the statements made, used, or caused to be made or used by Defendants, paid for claims for nursing home services that otherwise would not have been allowed.

138.    By reason of these payments, the Georgia Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT NINE
### Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(1)

47

139.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

140.    This is a claim for treble damages and civil penalties under the Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121, *et seq.*

141.    By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Georgia Medicaid program and other government funded health insurance programs false or fraudulent claims for improper payment for nursing home services.

142.    The Georgia Medicaid program, unaware of the falsity or fraudulent nature of the claims that the Defendants caused to be submitted, paid for claims that otherwise would not have been allowed.

143.    By reason of these payments, the Georgia Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

**COUNT TEN**
**Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121(a)(2)**

144.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

145.    This is a claim for treble damages and civil penalties under the Georgia Taxpayer Protection False Claims Act, Ga. Code Ann. § 23-3-121, *et seq.*

146.    By virtue of the conduct described above, Defendants knowingly made, used, or caused to be made or used false statements to the Georgia Medicaid program and other government funded health insurance programs material to false or fraudulent claims for improper payment for nursing home services.

48

147.     The Georgia Medicaid program, unaware of the falsity of the statements made, used, or caused to be made or used by Defendants, paid for claims that otherwise would not have been allowed.

148.     By reason of these payments, the Georgia Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT ELEVEN
### Indiana False Claims And Whistleblower Protection Act,
### Indiana Code § 5-11-5.5-2(b)(1)

149.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

150.     This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5, *et seq*.

151.     By virtue of the conduct described above, Defendants knowingly presented or caused to be presented to the Indiana Medicaid program false or fraudulent claims for improper payment for nursing home services.

152.     The Indiana Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

153.     By reason of these payments, the Indiana Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

## COUNT TWELVE
### Indiana False Claims and Whistleblower Protection Act,
### Indiana Code § 5-11-5.5-2(b)(2)

154.     Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

155.     This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act, Indiana Code § 5-11-5.5, *et seq*.

49

156.    By virtue of the conduct described above, Defendants knowingly made, used or caused to be made or used a false record or stamen to obtain payment or approval of a false claim from the Indiana Medicaid program false or fraudulent claims for improper payment for nursing home services.

157.    The Indiana Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by Defendant, paid for claims that otherwise would not have been allowed.

158.    By reason of these payments, the Indiana Medicaid program has been damaged, and continues to be damaged, in a substantial amount.

### COUNT THIRTEEN
### Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-604, *et seq.*

159.    Relator re-alleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

160.    This is a claim for treble damages and civil penalties under the Maryland False Health Claims Act, Md. Code. Ann. Health-Gen. § 2-601, *et seq.*

161.    By virtue of the conduct described above, defendants knowingly presented or caused to be presented to the Maryland Medicaid program false or fraudulent claims for improper payment for nursing home services.

162.    The Maryland Medicaid program, unaware of the falsity or fraudulent nature of the claims caused by defendants, paid for claims that otherwise would not have been allowed.

163.    By reason of these payments, the Maryland Medicaid program has been damaged, and continues to be damaged, in a substantial amount.